Process matters. It matters when you are a pharmaceutical company bringing a drug to market, and it matters when you are a federal magistrate judge that is dealing with a complex pharmaceutical tort case. And the process in this case, particularly the discovery process, went drastically off the rails. Let's start with the Rule 26 burden issue. And it focused the Court's attention on the magistrate judge's March 28, 2016 order. In that situation, in that order, there was no evidence that was provided to the magistrate judge of the burden that Amgen had in producing plaintiff's discovery requests. None at all. The magistrate judge had no way of knowing who Amgen's attorneys asked about formulating the burden when they presented it to the magistrate judge. We have no idea who they are. We have no idea what their qualifications are. We have no idea how they arrived at their analysis. And the magistrate judge acknowledged this herself in the order, and that's the most alarming thing here is that she acknowledged that in her order. She also acknowledged that when Amgen and defendants brought forth an analysis of what are called these standardized measure queries, that they only came up with 94 adverse events. And the magistrate judge, again, alarmingly so, put in that March 28 order that she had no idea how defendants ran their analysis. And that has been par for the course. Counsel, what's your specific legal argument here as to the error made by the district court that you're seeking reversal for? The specific error, one of them, the specific error here is that when a magistrate judge makes a Rule 26 proportionality analysis, there must be, according to this court's own precedence in general dynamics, a demonstration of fact, not an assertion of fact, which is what defendants came forward with and claimed, well, under Rule 11b-3, attorney briefing is somehow considered evidence. I have, as a representation to the court, I've scoured as many cases as I can. I've only found one case that supports their position. And it's a case they cite in their response brief. It's another Amgen case that was before the Middle District of Florida. And we would posit that that's not even the law in the 11th Circuit, let alone in this circuit, in light of general dynamics. Because, again, general dynamics calls for, when you look at undue burden, general dynamics particularly dealt with a protective order. But the undue burden analysis is the same under Rule 26c, the old Rule 26b, and now the new Rule 26b. The undue burden standard is the same. And in general dynamics, this court said, there must be a demonstration of fact. We have no affidavits. We have no declarations. We, in fact, we don't even have any unsworn declarations under 28 U.S.C. 1746. And we have no deposition testimony. We have absolutely, we don't know. What's the legal authority for requiring affidavits? If you look at several district court cases in this circuit, in addition to general dynamics, you will see, well, general dynamics, we would posit that that should govern the analysis here. But if you look at more recent district court cases coming out of the Eighth Circuit region, La Brea, which is a case out of the Western District of Missouri, there the district judge held that in a complex class action case involving, I believe it was one of the insurance companies, and it dealt with their payouts on labor depreciation when cars were damaged, the district judge said, when you're running an analysis of a complex database, I need to know who is running the examination. Who is running the analysis? I need an affidavit. I need something. Otherwise, all I have is attorney argument. And as this court has held, attorney argument is not evidence. And what is evidence? A demonstration of fact. And that's exactly what general dynamics says. Again, a precedent from this court. We need a demonstration of fact. Counsel, where were you going with this exercise that you're talking about now? Because if you trace the summary judgment opinion that dismissed this case, one of the central pieces of that order was that there was no expert testimony. And why was there no expert testimony? Because there was no discovery that the expert that we were going to put forward could analyze. That you were going to put forward? Absolutely. And this was the unidentified employee? Am I following you there? Based on the record, if you look at who we brought at the December 9, 2015 hearing, Dr. Linda Levesque, a pharmacoepidemiologist, that was going to be our expert. This unnamed, identified Pfizer employee who wrote, based on the information provided, drug profile, temporal association, positive challenges, result, the offense, this is going to be your expert that this product was the cause of your client's problem? When the magistrate judge asked trial counsel below at Dr. Janow's second deposition, when trial counsel represented that he had an expert, that was going to be Dr. Linda Levesque. And at that time, I bring the court's attention to this, trial counsel below didn't know the magistrate judge was going to just cut off discovery right then and there and say, nope, this is it. This is all the discovery you're entitled to. I'm not going to give you internal correspondence. I'm not going to give you any information about the Canadian monograph, which has MDS as an adverse event. It's not on the American FDA label, but the analog in Canada is the monograph. MDS is there. And we wanted to know why. Magistrate judge cut all that off, would not give us discovery on that. But at the time, trial counsel below made that representation, again, that was before the magistrate judge denied the motion to compel. Counsel, was it beyond quibble that the information you were seeking was only available through the defense? Most of it was. Yes, most of it was. Because depending on which adverse events were at play in terms of specific terms, and what I mean by those is terms that would be used as a standardized measure query. Depending on what those were, defendants may not have had to, that may not have been in a searchable database at that time. The only thing that would have been searchable is what the FDA had. And that's what we have access to. But we don't have access to every single adverse event that may have been related to MDS. Again, we dispute as what those terms mean. And it's interesting because below for the magistrate judge, if you look at the defendant's burden memorandum, there was a list of 17 terms associated with MDS. Those are all preferred terms. And note what the magistrate gave us in the March 28th order. One preferred term. MDS. The magistrate judge gave us less information than the defendants proffered. It's almost unheard of. Well, you were asserting that this Enbrel was the source and creator of the MDS that caused your client's problem. That is correct. And you said that you had an expert and the expert was based on this information provided that I just read here. Is that right? Well, at that juncture in time, when we actually identified the expert, that is the best trial counsel below could do. Because there was no information that could be, and again, these are Dr. Levesque's words, who is going to be our intended expert, that she could meta-analyze. There was nothing there. Because the magistrate judge had so hampered the amount of discovery in this case. And I want to make that connection, because it directly translates into the district judge's order granting summary judgment. And saying there, oh, there's no expert testimony, we have to grant summary judgment. But you have to trace it back, and that's the error here. It all relates back to March 28th. And what is it that you wanted to do had the magistrate not made this mistake? We would have done several things. We would want to know who are these people that ran this analysis from the defendants, and may we depose them? May we find out who they are? Why they believe the terms that we were asking for are not relevant? An example would be, and a very concrete one, is Dr. Peter Greenberg. An expert that they relied heavily on in their notice of discovery issues. And there was a December 9th proportionality hearing. And at that hearing, both experts were supposed to appear telephonically. Ours did. Dr. Linda Levesque. She was our intended expert. Counsel, were you going to address the sanctions issue? Yes, I would like to do that. Could I ask one question on Rule 26? What about the district court or the magistrate's statement in the March 28th order where she says, even without the defendants providing quantifiable evidence of burden, based on common sense and the search conducted by plaintiff's counsel during the hearing, the court finds the burden of discovery demands is unreasonable. Why isn't that sufficient to justify a limitation on the discovery, even without any evidence? For two reasons, Judge Carleton. Number one, if you look at several more recent cases, Medicine Over is one. That's out of, I believe, the District of Minnesota. There's also a Grissom case out of the Eastern District of Tennessee. Those cases say, yes, common sense is a factor. We don't deny that. But common sense cannot take the place of coming forward with proof of burden. Well, I thought she was saying your man did a search right there in the courtroom. And that's what you're focusing on? And showed that the breadth of what you were really asking for. Sure. And she combined that with her common sense and said that we've got to limit this. Sure. The trial counsel below did draw the court's attention. I believe in his objections to the March 28, 2016 order. And he basically rehabilitated himself and said, listen, when I ran that search, here's the problems with it. Here's why so many results came into play. Here's what actually would have happened. But the purpose and the utility of that demonstration was that while defendants were saying this will cost millions of dollars to run searches, and it will expend so much time, counsel did it in about, I can't really tell from the transcript, but it seems as though somewhere in a matter of minutes. And then so we have plaintiff's demonstration on one hand doing this in a matter of minutes. And then we have, on the other hand, unverified assertions of fact from counsel that this will cost millions of dollars. It will take months. It will take all these resources. And we have no proof. Okay. Thank you for the answer. You might want to address the sanctions business before your time. Yes. I'll go first to the motion to strike, and I'll try to itemize this as quickly as I can. On the motion to strike, it was inappropriate for defendants to insert a request for sanctions in a response to an objection. And if you look at the district court's own local rules, 72.2, that's the Nebraska Civil Rules, you're not allowed a reply. So when defendants improperly inserted, and it also violates Rule 7 of the federal rules, when they improperly inserted the request for sanctions in their response to the objections, it did not afford trial counsel below the opportunity to respond. And he had very limited ways of trying to respond to that. And under this court's own precedence, at least when it comes to 28 U.S.C. 1927, counsel who is potentially going to be sanctioned must have notice and the right to a hearing. And he would have been denied that if he had not had the chance or if he had not made that motion to strike and said to the court, this is inappropriate. I'd also draw the court's attention to the sanctions on the Jan Isles deposition. There were 99 objections. Of the ones that were arguing objections, there were 28. Trial counsel below won 20. He prevailed on 20 of those objections. How can you sanction counsel when he wins and prevails on many of the objections that were interposed at the objection? On the aspect of awarding sanctions for seeking sanctions, we would also ask this court to follow the Fourth Circuit decision in blue. And the Fourth Circuit decision says clearly that it is inappropriate to sanction counsel for trying to defend himself on a sanctions motion. Trial counsel should have that opportunity afforded to him to come forward with a legitimate response to the sanctions. And that's what was done in this case. And how do I know that? Because the magistrate judge denied a good portion of the relief they were seeking in the sanctions motion. He denied many of their costs associated with the Jan Isles deposition. She blatantly denied their Rule 37 request. It was not so lopsided. And there were legitimate arguments to be made there. Thank you. Thank you, Mr. Flanagan. Ms. Stetson? Good morning, Your Honors. May it please the Court. My name is Kate Stetson. I represent the defendants. I think the two main points that I would like to make bear on the first two questions that the panel asked. Chief Judge Smith, your question about the legal error at the bottom of this, and Judge Beam, your question about where are we going with this exercise. The cases in this Court that have reversed a district court or a magistrate judge for a gross abuse of discretion resulting in fundamental unfairness, which is the discovery reversal standard, or reversed a sanctions order for abuse of discretion, those cases are in circumstances where a district judge either didn't do their homework or didn't justify what she was doing or flew off the handle and imposed some kind of a nuclear draconian discovery sanction. This Court, the magistrate judge and the district court, exhibited vast reserves of patience with this case. And I would point you to, among other things, that the full transcript of the discovery hearing, which lasted for several hours in front of Magistrate Judge Zwart. The full transcript is in your joint appendix, and you can see that Judge Zwart is very patient as she works through the question of how these broad discovery requests actually bear on the general question of causation that's in front of the Court. She describes the plaintiff's discovery request like this, and I'm going to quote this, every document the defendants or any of its predecessors have or can access for any person who ingested Embryol and reported a symptom or impact on that person's red blood cells, white blood cells, platelets, or any precursor cells for those blood lines. That is her description of what was sought. And during that three-hour discovery hearing, she sought to figure out why those broad descriptions were relevant to general causation, which was, you remember, the only issue in front of the Court at that time. And you turn to the order denying clarification of her discovery order, and you'll note at note one that this magistrate judge actually suggests that perhaps trial counsel should consider affiliating Nebraska counsel with him, giving him a signal that she is being patient with him, but perhaps her patience is running out. Counsel, where else would a plaintiff get information about the consequences and medical side effects of the use of Embryol? Chief Judge Smith, the plaintiff actually received over 70,000 pages of information from Amgen. So to the extent that you are coming away with the impression that Amgen turned over nothing, that is false. We turned over 70,000 pages of documents, including, among other things, the entire what's called the Biologic License Application, which contains clinical trial reports, all of the reports that went into the study of Embryol. We also turned over, I think Mr. Weininger mentioned that the judge only ordered us to turn over adverse event reports for MDS. That is not accurate. The judge actually ordered us to turn over, and you can read this in her bullet-pointed discovery order, adverse event reports and the circumstances, the narratives underlying those reports of 14 different terms, not the 200-some-odd terms that the plaintiff had sought, but 14 terms that she decided bore on the MDS question. So that is where a plaintiff should have found evidence of causation. And to be frank, the plaintiff, as Magistrate Judge Swart and the district judge pointed out, the plaintiff in these cases normally has an expert on causation when the plaintiff files the lawsuit, and here he did not. He admitted it, and the lower court gave him a significant amount of latitude to develop that. The only thing he had coming into this case was the contention that Mr. Weininger mentioned here, which was the Canadian monograph. That was the sole representation that permitted this case to go forward on the question of general causation. Was your client the only supplier of Enbrel? Was it a drug of your client, and so they would have the exclusive amount of information that was available on it? My understanding is that our client and Wyeth, which was then acquired by Pfizer, were co-marketing Enbrel. One of the issues with what the plaintiff was seeking, in fact, was that the plaintiff was seeking documents from Amgen, Wyeth, Pfizer on these broad aspects of the case. But as to Enbrel, again, what Amgen turned over was tens of thousands of pages of documents bearing on the general causation question. And that actually leads me to the point, Judge Beam, on the question that you asked Mr. Weininger, where are we going with this exercise? The theory of plaintiff's case, and you heard it again in opening argument, is we didn't find any evidence of general causation, so we should have been entitled to keep looking to find evidence of general causation. As the district court and the magistrate judge both pointed out, that is not the way it works. And for the idea that the plaintiff was cut off on discovery, I would reiterate what the district court said in its summary judgment ruling, which is the district court and the magistrate judge gave the plaintiff three years to put together a case on causation, on general causation, and to find an expert on general causation. The expert that they found, Judge Beam, you're correct, was one expert, and it was a John Doe Pfizer employee who had made a note in a file. The representation that Linda Levesque was available as an expert that was made today was not in the expert disclosure that was filed below. So at the point where over three years in, the district court confronted a summary judgment motion that did exactly what the district court warned the plaintiff at the outset, which was if you don't have an expert on general causation, your case cannot go forward. The plaintiff did not have an expert on general causation, and the district court correctly concluded that her case could not go forward. What about this legal question, whether the defendant has to produce evidence on burden? Are you saying that no statements of counsel subject to Rule 11 are sufficient and can be given weight by the district court? Are you saying that there was no evidence necessary here? I think it's more than that, Judge Colititt. I think part of it is answered by the question that you asked, which is the district court explained when it reviewed this ruling that the magistrate judge was not making these discovery determinations in a vacuum. She knew what the scope of the request was, and she described the scope of the request. That's what I read to you earlier. She understood the magnitude of those requests. She understood from that demonstration that went awry in the magistrate judge's hearing the magnitude and the scope of those requests, and she also understood from the representations of counsel that, yes, we're made in a pleading, that the request bore on hundreds of thousands of study subjects over the last 20 years for studies pertaining to any symptom associated with MDS, which includes, among other things, fatigue and power. So are you saying the judge can rely on those representations of counsel and say counsel's representative would be this burden and rule on that basis? Is that the law? I think I would answer the question this way. That's probably a marginal case. But here you don't need to find, I think, that that is the law. What you need to find is I would submit what the district court found, which is that the district court, the magistrate judge, conducted a holistic inquiry. She looked at those representations, which, by the way, were not boilerplate. Amgen did not say this is burdensome, this is disproportional. Amgen explained through its yes. I understand they weren't boilerplate. I'm just trying to get down to whether they can be given weight even if they're not boilerplate, if they're not traditional forms of evidence. Well, I think if you look at the magistrate judge's ruling, ultimately what the magistrate judge concluded, and she chided both sides for this, and I will take medicine on that. She explains that it is the obligation collectively of both parties in the court to try to seek to proportionalize discovery. She wasn't receiving that contribution from the plaintiff, and she chided the defendants for not putting forward their evidence in support of the burden argument. However, what she went on to find is, based on my common sense, as you said, and the demonstration at the hearing, that she would narrow the disproportionate discovery. The plaintiff's argument here appears to be because there's- Would you kind of describe how the court used the demonstration as a basis for its decision? The demonstration, as I understand it, was using a computer in the courtroom to do a search. How did that play into the court's ultimate decision? The court mentioned that search in its decision. This was the demonstration where plaintiff's counsel ran 20 terms and produced a number of adverse event reports numbering in the thousands. The suggestion that that was actually kind of a wrong result is, I think, cold comfort for the idea that, from all of the terms that they wanted run, from not just one central location but many, maybe some of those turn out to be duplicates, but that's cold comfort. So, yes, she did rely on the demonstration that was conducted at the court hearing, but she also relied on her common sense, and she was entitled to do that, because the opposite- Understand what the plaintiff's argument here is, because there weren't affidavits, I get all my discovery, and that can't possibly be the law. The district court observed correctly that the magistrate judge always has the authority. When she is not receiving the collective contribution that she wants from the parties before her, always has the authority to proportionally narrow discovery, and the idea that she cut off discovery for good and for all time is also not true. The district court at the hearing, the district court subsequently, the district court in its discovery order, made clear that if more discovery was required, more discovery would be had. Well, the plaintiff told the magistrate, apparently, that based on the information provided, I assume that that was provided by discovery, the drug profile, temporal association, and positive D-challenge result, the events of this MDS is related to, probably related to Enbrel, and I assume that he was pointing that out to go beyond that in discovery in some way, to nail that down to see if that were true. And if that was the situation, then he was entitled to go after it, wasn't he? And the magistrate was required to let him do it. Well, I think no. What I think Your Honor is quoting is the statement from the John Doe Pfizer employee, because that was the single statement that supported the expert disclosure. That's right. That had emanated from the unnamed Pfizer employee. Correct. But as the district court pointed out, we made this observation in the brief as well, correlation does not equate with causation. You cannot build a basic general causation case off of one John Doe employee's musing that something was related to something else. You could use that information to move beyond it to do what you needed to do, right? No. Respectfully, I need to resist that. The idea of moving beyond that at this stage. Remember, that disclosure was made three years into this case. I see. Seventy-some thousand pages later. And the fact that that plaintiff received so much latitude to conduct discovery, to depose a witness, to look at those documents, and to gather, Chief Judge Smith, to your earlier question, public records that were available to him. And at the end of those three years, he had nothing, and the district court correctly concluded that. I see. If I can speak briefly to sanctions. The sanctions issue, I think, is equally clear. It's for abuse of discretion. There was no draconian sanction awarded here. There was no nuclear sanction awarded here. There was, in fact, a deep haircut given to the sanctions that were requested of the magistrate judge, from about $140,000 down to $25,600. The district judge, notably, reviewed that sanctions order, not for abuse of discretion, but de novo, precisely because there was a monetary award involved. And what he found, and this is in your appendix as well, is that the magistrate judge's decision was correct in all respects. We respectfully suggest that that is correct as well. If there are no questions on sanctions, I'll cede my time. What about his point on the one that was raised in an objection, and that there was a procedural flaw that didn't allow him to respond properly? Two observations, Your Honor. The first is that the notion that the plaintiff's counsel felt himself precluded from filing something is belied by the rest of the record, I would submit. But more importantly, the way to answer a request for sanctions would be to file a or to respond to it in some other fashion, not to move to strike the entire thing. What would you? I mean, normally there would be a motion for sanctions, right? And there would be a response to the motion. But here, I gather, there was no motion. There was a statement in the objection. There were two things. And what would the proper vehicle be then? He could have moved for leave to file a reply. Moved for leave, yeah. He could have moved for leave to file a reply, I suppose. The rules don't provide for that, but it might have been granted. That's right, but that's why you would move for leave. I think that would be the procedurally proper thing to do, rather than move to strike a request. Because, of course, as the district judge pointed out, you don't move to strike parts of pleadings. You move to strike pleadings. But more importantly, Mr. Weininger made the point that plaintiff's counsel was entitled to notice and an opportunity to respond before sanctions were ordered. He, of course, got that. Because what the defendants were ordered to do after they noted their request for sanction in that opposition, the defendants were ordered to submit a request for sanctions that laid out exactly what they were seeking, exactly how much it had cost them, and exactly why sanctions were required. He responded to that motion at great length, and the district court affirmed the magistrate judge's ruling on that. So there was ample notice and opportunity to be heard. If there are no further questions. Thank you, Ms. Stetson. Thank you, Your Honor. Mr. Weininger, I think you may have had just under a minute, but we'll give you a full minute to reply to any things you've heard from the opposing party. Thank you. Thank you very much, Chief Judge Smith. Three things. One, where is the case that says that pharmaceutical tort cases are exempt from Iqbal and Tomli? Because all you need do on Iqbal and Tomli is assert a plausible claim. Where is the case law, and defendants have yet to cite it, that says before you file your claim, you must have an expert witness ready to test it. Counsel, this isn't a motion to dismiss case. This is a summary judgment. Right, but what counsel said in her time was that we had no expert even coming to this case than we were supposed to, and in rebuttal I just want to assert that there is no case law that says that. But the assertion is made that you had not asserted a plausible claim. That's why you were doing discovery in order to try to do that. Isn't that correct? That would be incorrect. We did have an expert that believed that these claims were plausible, and they were plausible because if you look at the Canadian monograph, and if you look at, Judge Beam, what you brought up, if you look at what the Pfizer employee said, there is a connection here between MDS and Embrill. There is, and we were entitled to more discovery than that. Why didn't you list the other person as your expert witness when that request was advanced to you? We would have much rather gone, again, when we made that representation, we would have rather gone with someone that was our own expert, not who this Pfizer person was, particularly when we never had a chance to depose this person. And just quickly on the sanctions issue, on the motion to strike, I would bring the court's attention to the fact that trial counsel below asked defendants, please withdraw that section of your objection that deals with sanctions and file a separate motion, and I will respond. What did defendants do? Refused. Thank you. Thank you, Mr. Weininger. The court wishes to thank all counsel for your presence this morning, for the arguments you've provided to the court. We'll take your case under advisement.